UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

TAMMY RICHARDS,

    Plaintiff,

     v.

GOOD SHEPHERD FOOD-BANK,

    Defendant.

Civil Action No.

COMPLAINT
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Tammy Richards ("Plaintiff" or "Richards"), by and through undersigned counsel, and complains against the Defendant, Good Shepherd Food-Bank ("Defendant" or "GSFB"), as follows:

INTRODUCTION

1. Plaintiff claims that Defendant subjected her to unlawful medical examinations and terminated her from employment because of her disability (Type I diabetes) and in retaliation for requesting and needing reasonable accommodations. Defendant claims that Plaintiff was terminated due to her inability to perform the essential functions of her job in a safe manner but the facts do not support Defendant's position.

2. This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 et seq., the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., and the Rehabilitation Act ("Rehab Act"), 29 U.S.C. § 794 et seq.

PARTIES

3. Richards is a United States citizen residing in Monmouth, Maine.

1

4. GSFB is a Maine nonprofit corporation with administrative offices and a warehouse in Auburn, Maine.

## JURISDICTION

5. GSFB had 20 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

6. At all times material to this Complaint, GSFB has operated a "program or activity receiving federal financial assistance" within the meaning of the Rehab Act.

7. This Court has subject matter jurisdiction over Richards's federal and state claims pursuant to 28 U.S.C. §§ 1331and 1367.

8. On or about October 23, 2015, Richards filed a timely Complaint / Charge of Discrimination against GSFB alleging unlawful disability discrimination and retaliation with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

9. On or about May 25, 2016, the MHRC issued a Notice of Right to Sue with respect to Richards's state law claims.

10. On or about May 25, 2016, the EEOC issued a Notice of Right to Sue with respect to Richards's federal law claims.

11. Richards has exhausted her administrative remedies with respect to all claims set forth in this Complaint.

## FACTUAL ALLEGATIONS

12. Richards was employed by GSFB from May 9, 2013 until she was wrongfully terminated due to disability discrimination on August 13, 2015.

13. Richards worked for GSFB through a temporary staffing agency before she was hired as a regular employee.

14. Richards's job title was Warehouse Support II.

15. Richards was paid $13.00 per hour when she was hired in May 2013.

16. Richards was paid $13.79 per hour at the time of her termination.

17. Richards's job performance met or exceeded standards at all times.

18. Richards was a dedicated employee and committed to the service that GSFB provides to the community.

19. Richards volunteered on a regular basis at GSFB events.

20. Richards was never disciplined for anything.

21. Richards had no accidents or injuries at any time during her employment.

22. Richards was diagnosed with Type I diabetes in 1998 or 1999.

23. At the time of these events, Richards used an insulin pump and regularly tested and monitored her blood glucose levels.

24. Richards has some neuropathy in her hands that is caused by diabetes.

25. GSFB knew that Richards had diabetes early in her employment.

26. Richards discussed her diabetes with Nicole Nadeau in Human Resources when Richards applied for health benefits. Nadeau helped Richards sign up for benefits to pay for her prescriptions.

27. In about July 2014, Richards had a few episodes when her blood sugars were too low (hypoglycemia). When that happened, Richards always told Warehouse Manager Gary Footer or his assistant.

28. Richards did not operate machinery when she was feeling ill.

29. Richards's supervisors accommodated her requests.

30. In response to Richards's request for accommodation, GSFB sent Richards to Central Maine Partners In Health for a Fitness for Duty Evaluation.

31. Richards was seen there by a Family Nurse Practitioner ("FNP") on July 17, 2014.

32. The FNP met with Richards and discussed her diabetes. The FNP was not interested in hearing anything Richards had to say. After a short conversation, the FNP imposed the following work restrictions: "no forklift driving, no safety sensative (sic) tasks i.e. climbing or operating machinery; should not work alone in dangerous ambient environments."

33. The restrictions imposed by the FNP would have precluded Richards from performing her Warehouse Support II job.

34. Richards went to see her treating physician, Maylene Peralta, MD, FACE. Dr. Peralta is a specialist in endocrinology and diabetes.

35. Dr. Peralta did not agree that the work restrictions imposed by the FNP were necessary.

36. Dr. Peralta wrote a letter on July 17, 2014 that reads:

"Please be advised that Ms. Richards is under my care for type 1 diabetes. She requires regular testing and monitoring of her blood glucose level in order to safely perform tasks at work including forklift driving, climbing or operating [] machinery. Other than this restriction, she should be able to perform these tasks."

37. Richards provided Dr. Peralta's letter to Nadeau in Human Resources. Nadeau accepted it and Richards was allowed to continue performing her Warehouse Support II job duties.

38. Around the start of 2015, Richards asked Footer to assign her to duties that did not require her to work for long periods of time in the cooler. Richards told Footer that she was having difficulty working in the cooler because of her diabetes-related neuropathy in her hands.

39. Richards's request for an adjustment in her job duties was a request for reasonable accommodation.

40. Footer accommodated Richards by assigning her to work in the cooler only infrequently.

41. Richards's job performance was always good and it remained good from July 2014 through the date of termination.

42. GSFB asserts that during that time period, Footer observed a decline in Richards's job performance but Richards denies this.

43. Documentation of Richards's job performance refute GSFB's claim.

44. For example, the Performance Evaluation issued to Richards on March 24, 2015 rates her job performance as "Meets Standards" in five rating categories and "Exceeds Standards" in customer services. Comments include such things as, "Richards has no problems meeting her work deadlines. She has taken over the Check out area since Deb has been out and has done a great job…"

45. On May 1, 2015, just 73 days before Richards was terminated, she was honored for demonstrating GSFB's Core Values.

46. Richards received the award for not only doing her own job but for stepping up and doing Deb's job while she was on leave. Also, during the first week of July 2015, Richards was called upon to cover another co-worker's job while he was on vacation.

47. On July 28, 2015, Richards was not feeling well at work. She ate her dinner and checked her blood sugars. Richards gradually felt worse and at 3:00 PM when she checked again, her blood sugars were 500 mg/dl, which is high (hyperglycemia).

48. Richards asked a co-worker to sign her out.

49. Richards left the floor and a co-worker drove her home.

50. At home, Richards checked her insulin pump and found that the tubing was bent and that insulin was not getting administered.

51. Richards had planned to go to the emergency room for treatment but when she found the problem – the malfunctioning pump – she fixed it herself.

52. Richards took medication and rechecked her blood sugars every two hours.

53. By the next morning, Richards's blood sugars had returned to normal. She was still feeling unwell so she called out of work that day to rest.

54. Richards kept GSFB informed of her condition and the reason for her leaving work early on the 28th and staying home on the 29th.

55. Richards's request and need for time off from work on July 28 and 29, 2015 was a request for reasonable accommodation for her disability.

56. On July 30, 2015, GSFB sent Richards to Central Maine Partners In Health for another Fitness for Duty Evaluation by the same FNP who saw her in 2014.

57. The FNP read her notes from 2014, spoke to Richards for perhaps five minutes, and then told Richards that she was going to impose the same restrictions as before.

58. Richards objected because driving a forklift and operating machinery were some of her routine job duties.

59. Richards told the FNP that her treating doctor did not think she needed any work restrictions.

60. The FNP told Richards that she did not care what Richards's treating doctor said.

61. On July 31, 2015, Dr. Peralta wrote another letter that reads:

> "Please be advised that Ms. Richards HAS TYPE I DIABETES on insulin pump therapy and is under my care. She has improved her overall diabetes control in the past 6 months and is fit to work. She is able to perform the assigned duties related to her job without restrictions. Ms. Richards is fully aware of her responsibility in regulating her blood sugars while at work in order to prevent severe low or high blood sugar reactions."

62. Richards submitted Dr. Peralta's letter to Nadeau in Human Resources and then took a planned vacation during the first week of August 2015.

63. During her vacation, Richards volunteered as a GSFB representative at the TD Beach to Beacon 10k race.

64. When Richards returned to work, Nadeau told Richards that she (Ms. Nadeau) had not heard from the FNP at Central Maine Partners In Health.

65. Richards asked why they needed to hear from the FNP given that Richards had already turned in the second letter from Dr. Peralta. Nadeau said they needed to wait.

66. Richards asked Footer if he had any concerns about her operating a pallet jack. Footer said that if it was up to him, Richards could operate any of the machinery.

67. On August 13, 2015, the FNP re-issued the same Fitness for Duty Evaluation Recommendations to GSFB as in July 2014: "no forklift driving, no safety sensative (sic) tasks i.e. climbing or operating machinery; should not work alone in dangerous ambient environments."

68. Later that day, Richards was called to a meeting with Footer, Nadeau, and Vice President Sam Michaud.

69. They talked about their perception that Richards's diabetes was getting worse.

70. They commented on seeing Richards walking around with a bottle of orange juice in her hand.

71. They said they couldn't accommodate Richards anymore.

72. Nadeau said they had a letter from their occupational "doctor" saying that Richards was still a risk.

73. Richards asked why they would not accept her treating doctor's opinion stating that she was able to perform her assigned duties without restrictions. Ms. Nadeau said that her treating doctor worked for her and the occupational "doctor" worked for GSFB.

74. Nadeau also said, "Oh my god, Tammy, we can't take the risk of you running into something or hitting someone, our donors would be so upset."

75. Richards was extremely upset and started to cry.

76. Richards mentioned the names of co-workers who had actually run into and damaged things, something she had never done.

77. For example, Wade took out the door frame to the cooler and wasn't fired.

78. Norm wiped the hand sanitizer dispenser off the wall and took out the other side of the door and wasn't fired.

79. Justin got stuck on the dock and wasn't fired.

80. John damaged a wall and wasn't fired.

81. Richards also told them that the Department of Motor Vehicles has taken restrictions off her driver's license about six years ago.

82. Nothing Richards said made any difference and her employment was terminated.

83. GSFB claims that Richards was terminated because of her inability to perform the essential functions of her job in a safe manner.

84. GSFB's stated reason is untrue.

85. The FNP whose medical opinion GSFB is relying on to support its position took the position in July 2014 that Richards could not perform her job duties safely, e.g., operate a forklift or other machinery.

86. Richards continued to perform her job duties for a year after the FNP issued her opinion.

87. Richards did not injure herself or anyone else after the FNP opined that it was not safe for Richards to work as a Warehouse Assistant.

88. Richards had no accidents or injuries at any time during her employment.

89. There was one minor incident involving Richards driving a forklift. Richards hit a bracket with a pallet by mistake. She reported the incident to VP Sam Michaud. It was determined to be a minor incident and was not caused by Richards's diabetes. The bracket was fixed. No property damage occurred and no one was hurt.

90. Richards did nothing to put herself or anyone else at risk.

91. Richards was able to perform her job and perform it well and safely.

92. GSFB claims that GSFB sought out "alternatives" but no "alternatives" were available.

93. Defendant claims that GSFB "utilized the ADA's recommended verbal interactive process to identify alternative accommodations."

94. These allegations are false.

95. GSFB did not discuss any alternative accommodations with Richards.

96. Richards was never made aware of any consideration given to "alternatives."

97. GSFB also claims that it considered all reasonable accommodations that would assist Richards in performing the essential functions of the position, but that no accommodations were identified that did not result in the food bank hiring additional labor to complete these functions.

98. There is no factual basis for GSFB's claim that additional labor needed to be hired to accommodate Richards.

99. Richards was able to perform the essential functions of her job with or without reasonable accommodations.

100. Richards needed to regularly test and monitor her blood glucose level but that is something she did on her own without accommodation from GSFB.

101. Richards needed the ongoing accommodation of being assigned work in the cooler only infrequently.

102. Richards also needed to leave work early one day and stay home the next day due to a hypoglycemic event.

103. Richards's accommodation needs and requests did not pose an undue hardship on GSFB.

104. Richards's supervisor provided her with the accommodation of limited work in the cooler for over a year prior to her termination without any negative results.

105. Richards's request and need for a day and a half absence from work was permitted under GSFB's usual attendance and sick leave policies. If not, it is clearly a reasonable accommodation to permit an employee to take less than two days off from work for a disability-related reason.

106. Richards was treated differently and less favorably than non-disabled co-workers.

107. Richards was terminated because GSFB feared that a person with diabetes might run into something or hit someone with a forklift or pallet jack or other piece of machinery, even though Richards never did anything that put herself or anyone else in danger.

108. GSFB did not terminate non-disabled co-workers who ran into and broke things.

109. GSFB terminated Richards based on unfounded fears and stereotypes about her disability.

110. Richards operated a fork lift, pallet jack and other machinery while employed by GSFB and her diabetes never affected her ability to perform the duties of her job or perform them safely.

111. Richards's Type I diabetes is a *per se* disability under the MHRA.

112. Richards's Type I diabetes is a disability under the ADA and Rehab Act in that it is a substantial impairment of her endocrine system.

113. GSFB and its medical examiner regarded Richards as a person with a physical impairment and a disability as evidenced by their fearful reaction every time she asked for or needed a minor accommodation for her diabetes in connection with her job.

114. The medical examinations conducted by GSFB's agent/medical examiner were unlawful. The results of the examinations were not used in accordance with the MHRA, ADA, and Rehab Act. Instead, they were used to terminate Richards's employment.

115. There is direct evidence that GSFB terminated Richards's employment because of her disability and because they regarded Richards as a person with a disability.

116. The timing of the decision to terminate Richards's employment and animus of GSFB and its retained medical examiner evidences discrimination.

## COUNT I: MHRA - Disability Discrimination

117. Paragraphs 1-116 are incorporated by reference.

118. Defendant terminated Plaintiff on the basis of disability in violation of the MHRA.

## COUNT II: MHRA – Unlawful Medical Examination

119. Paragraphs 1-118 are incorporated by reference.

120. Defendant subjected Plaintiff to unlawful medical examinations in violation of the MHRA.

## COUNT III: MHRA – Failure to Accommodate and Retaliation

121. Paragraphs 1-120 are incorporated by reference.

122. Plaintiff asked for and needed reasonable accommodations.

123. Defendant failed to engage in the interactive process.

124. Defendant failed to reasonably accommodate Plaintiff.

125. Defendant terminated Plaintiff for requesting and needing reasonable accommodations in violation of the MHRA.

### COUNT IV: ADA - Disability Discrimination

126. Paragraphs 1-125 are incorporated by reference.

127. Defendant terminated Plaintiff on the basis of disability in violation of the ADA.

### COUNT V: ADA – Unlawful Medical Examination

128. Paragraphs 1-127 are incorporated by reference.

129. Defendant subjected Plaintiff to unlawful medical examinations in violation of the ADA.

### COUNT VI: ADA – Failure to Accommodate and Retaliation

130. Paragraphs 1-129 are incorporated by reference.

131. Plaintiff asked for and needed reasonable accommodations.

132. Defendant failed to engage in the interactive process.

133. Defendant failed to reasonably accommodate Plaintiff.

134. Defendant terminated Plaintiff for requesting and needing reasonable accommodations in violation of the ADA.

### COUNT VII: Rehab Act - Disability Discrimination

135. Paragraphs 1-134 are incorporated by reference.

136. Defendant terminated Plaintiff on the basis of disability in violation of the Rehab Act.

### COUNT VIII: Rehab Act – Unlawful Medical Examination

137. Paragraphs 1-136 are incorporated by reference.

138. Defendant subjected Plaintiff to unlawful medical examinations in violation of the Rehab Act.

### COUNT IX: Rehab Act – Failure to Accommodate and Retaliation

139. Paragraphs 1-138 are incorporated by reference.

140. Plaintiff asked for and needed reasonable accommodations.

141. Defendant failed to engage in the interactive process.

142. Defendant failed to reasonably accommodate Plaintiff.

143. Defendant terminated Plaintiff for requesting and needing reasonable accommodations in violation of the ADA.

### PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A. Declare the conduct engaged in by Defendant to be in violation of Plaintiff's rights;

B. Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate her rights;

C. Order Defendant to reinstate Plaintiff or award front pay to Plaintiff;

D. Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

E. Award equitable-relief for back pay, benefits and prejudgment interest;

F. Award compensatory damages in an amount to be determined at trial;

G. Award punitive damages in an amount to be determined at trial;

H. Award nominal damages;

I. Award attorney's fees, including legal expenses, and costs;

J. Award prejudgment interest;

K.     Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability;

L.     Require Defendant to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate discrimination in the future;

M.     Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

N.     Require that Defendant train all management level employees on the protections afforded by the MHRA, ADA, and Rehab Act;

O.     Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully terminated her because of her disability; and

P.     Grant to Plaintiff such other and further relief as may be just and proper.

Dated:  June 15, 2016                          /s/ Chad T. Hansen
                                               chansen@maineemployeerights.com

                                               /s/ Peter Thompson
                                               pthompson@maineemployeerights.com

                                               Attorneys for the Plaintiff

                                               MAINE EMPLOYEE RIGHTS GROUP
                                               92 Exchange Street 2nd floor
                                               Portland, Maine 04101
                                               Tel. (207) 874-0905
                                               Fax (207) 874-0343